**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

**Case No. 1:22-cv-00510**

**BRYAN ANTHONY REO**

**V**

**LUDIVINE JOAN CLAUDIA REYNAUD**

---

**EXPERT REPORT PREPARED FOR PLAINTIFF**
**BRYAN ANTHONY REO BY ROBERT J. FISHER**

---

## BACKGROUND AND QUALIFICATIONS

General Summary

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including the past 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles area of California. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions and industries as well as to nonprofits and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g., journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm has provided litigation support for over 100 civil and criminal cases (including trials) throughout the United States. Additionally, for the past 16 years I have served as an expert witness and for decades have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

Litigation Experience

Because of my 42-year background in representing law firms and being involved in litigation and trials, handling communications and the "Court of Public Opinion," I have amassed a great amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation as well as crisis communications situations in which I was called to provide counsel or services, include:

1

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Beating (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this related to what the public perception of the situation was, how could it be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long terms. As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media source or analyst.

Expert Witness

In 2006, due to my long career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness. Since then I have served as an expert witness in approximately 80 cases on behalf of both Defendants and Plaintiffs in 29 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Ohio, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Maryland, Louisiana, Delaware, Michigan, Wisconsin, Kentucky, Arizona, Texas, Alabama, Pennsylvania) plus the District of Columbia. I have provided sworn testimony in depositions, hearings, arbitration hearings and trials. The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception. I have also been involved in cases relating to journalistic ethics and procedures, unauthorized use of a person's image, professional malpractice, improper business practices, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

Education

San Jose State College    Bachelor of Arts degree    Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge. Numerous seminars, workshops and other education forums to enhance knowledge.

Professional Experience

- New York Times — Newspaper — Reporter
- Los Angeles Beautiful, Inc. — Non-profit organization — Public Relations Director
- Harshe, Rotman & Druck — National PR Firm — Asst. Account Executive
- Burson-Marsteller, Inc. — National PR Firm — Account Executive
- Atlantic Richfield Plaza — Shopping Center — Promotion Director
- Doremus & Company — National PR Firm — Account Supervisor
- Fisher & Associates, Inc. — PR Firm (Founded 1978) — President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army and I also interacted with the German media/community.

Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during the past four-plus decades.

Professional Memberships

Local and national professional, trade and other organizations I have been a member of during my career, include:

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g., crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g., UCLA), to national conventions (e.g., American Bar Association) and at a variety of speaking forums (e.g., weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g., legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites. (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

3

- Defamation/Reputation Harm Articles – Among the articles I have written specifically addressing defamation and reputation damage have included:

  - *"Image/Reputation/Brand Damage: Does Litigation Solve the Problem?"*
  - *"Defamation: The Stain That Can Never Be Removed."*
  - *"Negative Communications: The Process of Absorption and Transmission."*
  - *"Harmful Media Exposure: Beware of the Hidden Sources of Damage."*
  - *"Defamation: Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
  - *"Defamation Defense: Is there a Third Bite of the Apple."*
  - *"Image/Reputation Damage From Media News Reports: Is it Legally Actionable."*
  - *"Reputation Damage Can Emanate From Actions/In-Actions...As well as Words."*
  - *"Defamation Cases: Why an Expert Witness is Vital."*

## LEGAL INFORMATION

List of cases for which I have provided testimony over the past four years

During this period, I have had my deposition taken 15 times:

- October 10, 2017 and November 6, 2017 – *Lewis M. McLeod v. Duke University, Suzanne Wasiolek, Stephen Bryan, Dr. Cecile Irvine Bradshaw (nee Cecile Starke Irvine) aka Dr. Celia Irvine Starke Irvine) aka Dr. Celia Irvine,* Superior Court, Durham County, North Carolina.

- April 18, 2018 – *UTC-10 Consulting LLC and Brian McKee v. Board of Water Supply, City and County of Honolulu,* Circuit Court of the First Circuit Court, State of Hawaii.

- December 19, 2018 – *Ohana Military Communities, LLC and Forest City Residential Management, LLC v Cara Barber,* United States District Court, District of Hawaii.

- May 8, 2019 – *Robert Gish, M.D.; Robert G. Gish Consultants, LLC v Celeste E. Le Sage,* Superior Court of California, County of San Diego.

- January 23, 2020 – *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles

- January 31, 2020 – *Examination Board of Professional Home Inspectors and American Society of Home Inspectors, Inc. v International Association of Certified Home Inspectors and Nickifor Gromicko a/k/a Nick Gromicko.* United States District Court for the District of Colorado

- February 27, 2020 – *Party Animal, Inc. v Evanger's Dog and Cat Food Co, Inc., Nutripack, LLC,* United States District Court, Central District of California.

- June 12, 2020 – *Riley's American Heritage Farms, James Patrick Riley v James Elsasser, Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, David S. Nemer, Ann O'Connor, and Brenda Hamlett,* United States District Court Central District of California – Eastern Division.

4

- February 24, 2021 - *Hebrew Health Homes Network, Inc., Arch Plaza, Inc. Arch Plaza Properties, Inc. Aventura Plaza, Inc. Jackson Plaza, Inc., Hebrew Homes of Miami Beach, Inc., Ponce Plaza, Inc. Ponce Plaza Properties, Inc., Hebrew Home Sinai, Inc., South Beach Plaza, Inc., Hebrew Homes of South Beach, Inc., South Beach Nursing and Rehabilitation Center, Inc., University Plaza Rehabilitation and Nursing Center, Inc., University Plaza Properties, Inc., Hebrew Homes management Services, Inc. v* Greenberg Traurig, P.A., a Florida Corporation, Greenberg Traurig, LLP, a New York Limited Liability Partnership and William B. Eck.  Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida

- April 27, 2021 – *Russ Newman v American Psychological Association (APA), David H. Hoffman, Sidley Austin LLP and Sidley Austin (D.C.) LLP.*  American Arbitration Association, Washington, D.C.

- June 18, 2021 - *The Law Offices of Brenden R. Appel and Brenden R. Appel v Georgia's Restaurant and Pancake House, Inc. and Harry Kulubis.* Circuit Court of Cook County, Illinois County Department, Law Division.

- December 10, 2021 – *Legno Bastone, Inc. v Provenza Floors, Inc. and Brian J. Sullivan.*  In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida Civic Action.

- March 16, 2022 – *Doan Restoration of Arizona, LLC and Doan Restoration of Michigan, LLC v Paul Curtis, Jane Doe Curtis and PR&C Specialities, LLC*, Superior Court of the State of Arizona, Maricopa County.

- April 7, 2022 – *Michael Coleman and Jamael Stewart v City of Delray Beach.*  In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

During this period, I have testified at the following two arbitration hearings:

- On June 6, 2016, I provided video testimony at the American Arbitration Association hearing in the case of *Lopez v. UnitedHealth Groups, Inc.*, referenced above.

- On December 11, 2019, I testified at an arbitration hearing in the case of *Susan M. Packard v Morgan Stanley,* Financial Industry Regulation Authority, Washington, D.C.

During this period, I have testified in three jury trials:

- On January 24, 2020, I testified in the trial of *Harry Loveland; Charlene Loveland v Sol Del Cielo, LLC; Abraham Sandoval, Jr, an individual; M. L. Culkin Construction Company, Inc.,* Superior Court of California County of Los Angeles

- On February 24 and March 2, 2020, I testified in the trial of *Justice Protection Project, Lenore Albert v Xcentric Ventures LLC, Yelp, Inc. George Olivo, Megan Nikolic, Pam Ragland, Karen Rozier, Sheryl Alexander and Rene Dawson,* Superior Court of California County of Orange

- On February 25, 2020, I testified in the trial of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona

- On September 23, 2022, I testified in the trial of *Linda Fairstein v Netflix, Inc. Ava Duvernay and Attica Locke*, United States District Court, Southern District of New York.

During this period, I have testified in one bench trial:

- On September 21, 2021, I testified in the trial of *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

Assignment

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing. I have also been acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair. Additionally, I am an experienced expert witness who has been involved in approximately 80 cases, 71 of which were for defamation or reputational harm. Due to that experience and expertise, I have been retained by the Plaintiff, Bryan Anthony Reo, to serve as an expert witness in this case on his behalf. I have been asked to analyze and offer my insights, comments, conclusions and opinions regarding all the Causes of Action of Common Law Defamation and Invasion of Privacy – False Light cited in the Complaint against the Defendant, Ludivine Joan Claudia Reynaud.

Compensation for Review, Report and Testimony

For consultations, information gathering, research and the preparation of this report, my compensation was $600 per hour. If a deposition is required, the rate will be $750 per hour with a four-hour minimum. Should I testify at the trial for this case, the rate will be $3,000 for a half day and $6,000 for a full day. Travel fee is $175 per hour and travel expenses would be required to be reimbursed as well.

## CASE BACKGROUND

Reason for Lawsuit

Defendant Ludivine Joan Claudia Reynaud made allegedly false, derogatory and defamatory statements about Plaintiff Bryan Anthony Reo that Defendant published to third parties by making reports to law enforcement agencies in two countries as well to other third parties, government entities, and upon information and belief, to non-governmental entities (private third parties). The purpose of these communications and reports was to cause Plaintiff to be charged with a crime that Plaintiff did not commit and that Defendant knew Plaintiff did not commit.

Profile of Parties in This Case

A brief profile of the litigants as well as other individuals and entities germane to the issues that resulted in this lawsuit is as follows:

Plaintiff

Bryan Anthony Reo ("Reo") – A resident of Mentor, Lake County, Ohio.

Defendant

Ludivine Joan Claudia Reynaud ("Reynaud") – A French national who lives in Belgium.

Plaintiff's Background

Reo is an attorney who practices in Mentor, Ohio. His firm, Reo Law LLC, concentrates its practice in civil litigation, consumer protection, defamation and appeals. He is licensed to practice in the states of Ohio and Michigan as well as before the United States Court of Appeals for the 3rd and 6th Circuits.

Defendant's Background

Reynaud holds a five-year degree issued by Institut d'études politiques de Paris (commonly known as "Sciences Po"). She works as a credentialed assistant in the European Parliament. She is a member of the French-based National Rally Party of Marine Le Pen and the Belgium-based Vlaams Belang, a successor to a previously proscribed/outlawed neo-fascist association in Belgium which the Belgium government legally dissolved for violations of Belgian law.

Initial Relationship

Reo and Reynaud met online shortly after Reo's ex-wife, Stefani Rossi Reo ("Stefani"), separated from him and moved to Brazil in late 2019. With her living in Brussels and him in Mentor, they actively corresponded with each other. Reo reports that Reynaud had been dissatisfied with her job and wanted to have a romantic relationship with him. She wanted to move in with him, get married and raise a family. She proffered she could also work with him in some legal capacity.

In February 2020, Reynaud traveled to Mentor and stayed for a period of time and they engaged in a romantic and a physical relationship (most of which she initiated). She went back to Brussels with the intention to settle her affairs there (personal and business) and return to the Mentor permanently. While in Brussels, Covid-19 came and she was unable to do so.

Tumultuous Relationship

During the months they were apart because of Covid-19, Reynaud kept accusing Reo of wanting to and preparing to reconcile with his ex-wife. (Note: She was unaware that he didn't reconcile with Stefani until May 2021 and didn't learn it until late June or early July of that year.)

Reo informed her he was possibly reconciling with Stefani, and would not leave his ex-wife for her. In his complaint, Reo stated that the following chain of events happened:

- When informed of the potential reconciliation with his wife, Reynaud was livid and called her a *"droopy eyed dog faced big nose Brazilian 6."*

- In April of 2020, Reo officially sought to break up with Reynaud. They continued to communicate.

- Reynaud broke up with him on May 15, 2020, but the next day recanted and begged him to take her back.

7

- That same day (May 15, 2020), she called him from work and spent four hours talking about how and why she was going to commit suicide (while crying).

- Reo tried to end the relationship both in July and August of 2020.

- There was a five-week period in August and September they didn't speak.

- There was a five-week period in August and September they didn't speak. During this time Plaintiff bought a plane ticket for Stefani to return to the United States from Brazil as Plaintiff had made up his mind to reconcile with his ex-wife, but Stefani was unable to board her flight and could not leave Brazil at that point, and sometime in September Plaintiff remained in contact with Reynaud."

- The relationship continued on an on-and-off basis.

- Reynaud would apologize for his *"tolerating her insufferable mood swings."*

- At the end of November 2020, she told him she had been under care of psychiatrist and was under medication.

- On January 7, 2021, Reo made a joke referencing both Trump and Hitler which incensed Reynaud and they didn't speak again until May 10, 2021 (at which time he was back with his ex-wife).

- On May 10, 2021, Reynaud sent Reo 119 emails during her 12-hour workday using the European Union Parliamentary computer and internet. They contained vulgarities, lewd remarks, references to genitals, and the emails continued until he informed her of the Ohio telecommunications harassment statute and told Defendant Reynaud that Plaintiff would sue her in Ohio.

- She ceased the vulgarities and lewd content but continued to send emails at a high volume.

- On May 11, 2021, she called him multiple times between 4 and 6 a.m. in the morning his time.

- Reo and Reynaud maintained some contact from May through August.

- On August 9, 2021, Reynaud was hospitalized for an accidental drug overdose which he believes may have been suicide attempt. She admitted she had been seeing psychiatrist for emotional problems.

- The last telephone contact between the two of them was on August 27 or 28 in 2021.

- Reo filed a lawsuit against Renaud on March 31, 2022.

Defendant's Allegations and Actions Against Plaintiff

Beginning as early as September 2021 and continuing to the present, Reynaud has filed reports of misconduct against Reo with numerous law enforcement agencies in both Brussels and the United States. These include:

- Reynaud reports that she filed several police reports in Brussels between September and November 2021.

- She filed a report with the police in Mentor in March of 2022.

- She filed six reports with the Federal Bureau of Investigation (FBI).

- She has communicated her grievances, it is believed, to the Belgian Embassy in Washington, D.C. and possibly the Department of Justice.

- She solicited both the Municipal and County prosecutors in his area to act against him.

- She is seeking criminal charges against him in Belgium.

Among the allegations that Reynaud is making against Reo to these agencies, include:

- That he was engaging in a campaign of harassment against her to include threatening messages through mails, text messages and sending correspondence to her home and office as well as her supervisor's mailbox.

- That he was stalking her.

- That she believed he was responsible for spoof postings on websites using her name and impersonating her on porn sites.

- That she believed he could have been responsible to putting pornographic (semi-nude, nude and sexually explicit pictures) of her on the internet.

- That he threatened her with a civil lawsuit.

- That he threatened her physically and that she was concerned that he was going to travel to Belgium uninvited and unannounced and confront her and possibly hurt her.

   (Side note:  The Plaintiff did indicate he might come to Belgium but it would have been for the purpose of having a civil conversation about their situation.)

In her own words, following is an email that Reynaud sent the Mentor Police Department on March 3, 2022:

   *"I have been trying to call you several times and left you a voicemail. I am taking the liberty of writing to you with respect to one of your residents in Mentor, Ohio who has been displaying stalking and harassing behavior towards me over a six-month period: sending threatening messages through mails, text messages, sending letters to my home and office address in Brussels, Belgium, as well as on my supervisor's mailbox at work. Most of the threats, when there are any, revolve around his suing me and/or my boss on fanciful grounds and for imaginary offenses or otherwise sabotage my job to get me fired.*

   *He may possibly have used spoof accounts to contact me on one social media platform as well as impersonated me on porn sites (given that platform do not yield IP address information without a court subpoena, I cannot begin to prove his involvement in this however).*

> *This situation has been going on for six months now, despite my best efforts to fend it off – blocking everywhere, changing my phone number, never responding to any communications etc. It has had a tremendous impact on my emotional wellbeing, as well as on my work performances."*

Following is an email she sent to Daniel Shaw in Mentor on March 4, 2022:

> *"I have been harassed and stalked by a resident from Mentor Ohio, named Bryan Reo, who is a lawyer, for six months now.*
>
> *The situation is getting completely out of hand and is taking a tremendous toll on my mental health and well-being. Right now, this his person is apparently either creating fake emails or else asking other people to harass me, both on my social media platforms (most of which I have now shut down), but also by using my supervisor's professional email (she is a member of the European Parliament).*
>
> *This was the last straw, after months of harassment, with mails, packages and letters being sent to my home address, my workplace in Belgium, threats about suing me and my supervisor for imaginary offences, or defaming me to get me fired, etc."*

Following is an email she sent to Shaw on March 11, 2022:

> *"This person is using my professional email address (which I cannot have changed) and that of my supervisor (which cannot be changed) also, apparently, creating fake accounts to tell stories about myself on social media platforms (I can prove it without the IP address though). He has also been sending letters to my office, which I cannot stop him from doing - I contacted Fed Ex, to no avail."*

Following is an email she sent to Daniel Molnar; another Mentor law enforcement official on March 11, 2022:

> *"Most recently, in those emails, he has been writing about publishing damaging (and untrue) information about me online, claiming he has bought a domain name bearing my name to that effect (ludivinereynaud.com, I checked and the domain name has indeed been bought by someone). He has also been writing about "adding me into a lawsuit", as well as my supervisor, and my father for some unknown offense."*

Mentor Police Report

Law Enforcement officials in Belgium took no action based on the Defendant's allegations because they did not have jurisdiction because the Plaintiff lived in the United States. Mentor law enforcement officials did investigate her claims and communicated with both Reynaud and Reo. On March 28, 2022, they issued their findings in a report, to include this excerpt:

> *"He (Reo) still has feelings for her and cares for her (Reynaud), so he sent her emails asking how she is doing. He believes she may have had him deleted off of You-Tube and may have had something to do with telemarketers from Brussels calling him. This didn't sit well with him, so this is why he mentioned suing her in his emails.*

10

*After hearing his side of the story, I expressed to him that Ludivine wants nothing more to do with him and it was in his best interests to cease any and all correspondence with her. He said he understood and would consider the request. I thanked him for his cooperation and told him he could call MPD if he received any unwanted correspondence from her. I warned him though, that we had no jurisdiction in regard to criminal matters, since she resided in Brussels Belgium. No further police action at this time."*

## LAWSUIT INFORMATION

The lawsuit was filed on behalf of the Plaintiff, Bryan Anthony Reo, on March 31, 2022, in the United States District Court Northern District of Ohio, Eastern Division.

<u>Causes of Action</u>

The Causes of Action in this lawsuit are:

- Common Law Defamation
- Common Law Invasion of Privacy – False Light
- Abuse of Process

<u>Relief Sought in Lawsuit</u>

Through its lawsuit, the Plaintiff is seeking the following relief:

- Judgment against Defendant Ludivine Joan Claudia Reynaud in Plaintiff's favor in an amount of money that exceeds one hundred and fifty-thousand dollars ($150,000.00) for general, compensatory, non-economic, and special damages.

- Award Plaintiff punitive damages against Defendant Reynaud in an amount the trier of fact deems just and proper.  (Plaintiff seeks $50,000.00 in punitive damages).

- Award Plaintiff all costs associated with maintaining the instant civil action.

- Award Plaintiff all pretrial and post-trial interest on all monetary relief awarded to Plaintiff.

- Award Plaintiff injunctive relief by ordering Defendant Reynaud to remove from the World Wide Web and not republish thereto derogatory or invasive materials about Plaintiff that Defendant Reynaud or Defendant Reynaud's agents published about Plaintiff.

- Award Plaintiff all other relief to which Plaintiff is entitled as a matter of law or equity

<u>Basis of the Cause of Action of Common Law Defamation</u>

In his Complaint, the Plaintiff cited the following factors for this Cause of Action:

- Defendant Reynaud published false and defamatory statements about Plaintiff to third parties via making police reports and sending emails to police, officials with the prosecutor's office, officials with the City of Mentor, and other third parties, government entities, and upon information and belief non-governmental entities (private third parties).

- Defendant Reynaud's false and defamatory statements about Plaintiff were made by Defendant Reynaud without privilege. Defendant Reynaud is not a mandatory reporter under Ohio law and is not afforded privilege to make false or defamatory accusations in a report to law enforcement.

- Defendant Reynaud acted with at least negligence in making false and defamatory statements about Plaintiff.

- Defendant Reynaud failed to act reasonably in attempting to discovery the truth or falsity or defamatory character of Defendant Reynaud's publication about Plaintiff. Indeed, Defendant Reynaud had actual knowledge that the statements were false because Defendant Reynaud knows that Plaintiff has never possessed pornographic material about her and has never disseminated such material.

While not a Cause of Action in the lawsuit, the Plaintiff contends that he has also been damaged by Defamation Per Se for the following reasons:

- Defendant Reynaud's false and defamatory statements about Plaintiff are defamatory per se insofar as said statements reflect upon the character of Plaintiff by bringing him into ridicule, hatred, or contempt, and affects Plaintiff injuriously in his future trade or profession.

- Defendant Reynaud's false and defamatory statements about Plaintiff are defamatory per se to the extent that most of the statements in question are allegations or accusations of criminal conduct in violation of various sections in the Ohio Revised Code and the United States Code. Other allegations are defamatory per se to the extent that they accuse the Plaintiff of conduct that is morally reprehensible or would cause him to be viewed in an objectionable manner by his community.

- Upon information and belief Defendant Reynaud is a serial defamer who is used to making false accusations against colleagues, supervisors, male politicians (in France and Belgium). Defendant Reynaud knew that if she defamed Plaintiff, an accomplished defamation attorney established in the Cleveland legal community, she was almost certainly going to be sued by Plaintiff for defamation in a court located in Ohio. Defendant Reynaud acted with Sullivan actual malice, common law malice, and out of a desire to provoke litigation.

<u>Basis of Cause of Action of Invasion of Privacy – False Light</u>

In his Complaint, the Plaintiff cited the following factors for this Cause of Action:

- Defendant Reynaud made false and derogatory statements about Plaintiff that Defendant published to third parties via making police reports and sending emails to police, officials with the prosecutor's office, officials with the City of Mentor, and

other third parties, government entities, and upon information and belief non-governmental entities (private third parties).

- The false and derogatory statements made by Defendant Reynaud about Plaintiff placed Plaintiff before the public in a false light and they are highly offensive to a reasonable person.

- Defendant Reynaud is at fault and knew or acted with recklessness as to the truth of the statements made by Defendant Reynaud that concern Plaintiff.

- Defendant Reynaud has actual or constructive knowledge that Plaintiff:

  - Did not impersonate Defendant Reynaud on any websites, pornographic or otherwise.

  - Did not disseminate pornographic material of her, concerning her, or purporting to represent her, to any third party, and that Plaintiff never was even in possession of pornographic

General Defenses

With respect to the lawsuit, the Defendant offers the following General Defenses:

- The Defendant had never been a member of any "neo-fascist" party.

- The National Rally is recognized as a mainstream political party in France.

- The Plaintiff's allegations are scandalous, malicious and irrelevant to Plaintiff's claims, and expressed for the sole purpose of harming Defendant's personal and professional reputation.

- The Plaintiff's assertions regarding alleged statements by Defendant concerning her work in French politics are irrelevant to his claims and made for the sole and improper purpose of harming Defendant's personal and professional reputation.

- The Defendant specifically denies the false, absurd and baseless allegations that she claimed to have "caused a scene" that resulted in the termination of an EU employee, or that she tried to "shame" politicians into "being nice to her."

- The Defendant specifically denies the false, absurd and baseless allegations that she claimed to have "caused a scene" that resulted in the termination of an EU employee, or that she tried to "shame" politicians into "being nice to her."

- The Defendant avers that allegations concerning her mental health are scandalous, malicious, and irrelevant to Plaintiff's claims, and expressed for the sole purpose of shaming and embarrassing Defendant and harming her reputation.

- The Defendant states that the alleged statement concerning Plaintiff's wife is irrelevant to Plaintiff's claims and is made purely for the purpose of embarrassment and oppression.

- The Defendant only admits to contacting the Mentor Police Department out of fear of Plaintiff's behavior towards her including the relentless harassment of her.

- The Plaintiff's bizarre, unhinged, and ungrounded statements concerning Defendant's motives in seeking police protection are scandalous, malicious, and irrelevant to Plaintiff's claims, and expressed for the sole purpose of harming Defendant's personal and professional reputation.

- The Defendant avers that the allegations concerning her mental health are scandalous, malicious, and irrelevant to Plaintiff's claims, and expressed for the sole purpose of harming Defendant's personal and professional reputation. These false allegations are made for the bizarre and cruel purpose of shaming, embarrassing and degrading Defendant for allegedly requiring psychiatric care.

- The Defendant avers that the false and baseless allegations regarding "obvious and clear ties to neo-Nazis and Holocaust deniers" are scandalous, malicious, and irrelevant to Plaintiff's claims, and expressed for the sole purpose of harming Defendant's personal and professional reputation.

<u>Affirmative Defenses</u>

With respect to the lawsuit, the Defendant offers the following Affirmative Defenses:

- The Complaint fails to state claims upon which relief can be granted.

- The Court lacks jurisdiction over the person of the Defendant.

- The Venue in this Court is improper.

- This Court is an inconvenient forum under applicable forum non convenient principles.

- The process and service of process were and are insufficient and fail to comply with the applicable requirements under the Hague Convention, Belgian law, and Fed. R. Civ. P. 4(f).

- Any recovery to which Plaintiff might have otherwise been entitled is barred in whole or in part by the applicable statutes of limitation and by laches.

- Plaintiff's claims fail for lack of damages.

- Any allegedly defamatory statements by Defendant were made with a belief that they were and are true.

- The Defendant's alleged statements to the Mentor Police Department, prosecutors, and other government officials enjoyed either absolute or qualified privilege.

- Plaintiff's claims are brought for an improper purpose. The claims are made to punish, abuse, and harm the Defendant for ending a personal relationship, are legally without foundation or merit, and are improperly before the Court.

- Any allegedly defamatory statements were true and/or made as a matter of opinion, and are thus not actionable.

- The statements alleged in the Complaint in support of defamation and false light claims do not constitute defamation per se, did not damage the Plaintiff in any material way, and did not damage his reputation.

- The Complaint is shot through with flagrantly false statements concerning Defendant's mental health, politics, and world views. Although irrelevant to Plaintiff's claims, these statements so infect the Complaint with lies and nonsense that every allegation and claim should be dismissed as groundless and brought in bad faith.

- Plaintiff is barred from recovery on each Count set forth in the Complaint because any recovery to which Plaintiff might otherwise have been entitled is barred by the doctrines of acquiescence, waiver, and estoppel.

- There is no basis to award attorney fees, costs, or punitive damages.

- To the extent Plaintiff seeks punitive damages, such claims are limited by R.C. 2315.21.

- Defendant specifically reserves the right to amend this Answer to raise further affirmative defenses which may develop during this proceeding.

<u>Plaintiff Denials</u>

With respect to the Defendant's allegations, the Plaintiff offers the following input:

- The Plaintiff did not film, record, photograph, or in any way record or store depictions of said acts. This point is relevant because Defendant Reynaud would later claim to police that Plaintiff was posting pornographic content of her online and impersonating her on pornographic websites. Plaintiff has never been in possession of any pornographic material of Defendant Reynaud and has never posted any such content anywhere online.

- In March 2022 Defendant Reynaud made an accusation to police (in Mentor, Ohio) regarding Plaintiff allegedly impersonating her online on pornographic websites posting pornographic material involving her, and claimed that pornographic material existed. She did not provide any evidence to police.

- The Defendant Reynaud uttered a calumny against Plaintiff and knowingly made a false accusation to police that Plaintiff had perpetrated the crime known as "revenge pornography," R.C. § 2917.211, which essentially entails the unauthorized and non-consensual release of pornographic material.

15

- The Plaintiff has never impersonated Defendant Reynaud in any capacity, whether in person, on the phone, online, let alone online on pornographic websites.

Plaintiff's Grievances Against Defendants

Following is a list of grievances relating to actions and words which the Plaintiff cites against the Defendant and constitutes his justification for including them in this lawsuit.

- The Defendant made accusations to local police that he had committed high degree misdemeanors and even felonies (particularly sexually oriented/based crimes)

- The Defendant embarked on campaign to socially isolate him and compromise Plaintiff's reputation in his community while seeking to have Plaintiff wrongfully charged with crimes and subjected to the ridicule and scorn that accompanies being accused or charged with a sexually based offense (illegal dissemination of pornographic material).

- The Defendant Reynaud accused Plaintiff to the police in Plaintiff's hometown of telecommunications harassment, specifically with Reynaud stating that Plaintiff harassed her from September 2021 to March 2022, despite Defendant Reynaud's own admission that she never once responded to any of Plaintiff's emails from September 2021 to March 2022, let alone respond with a "cease/desist" request.

- The Defendant Reynaud caused to be initiated against Plaintiff a police investigation for telecommunications harassment in Ohio that was initiated on or about 3 March 2022 and was closed on or about 20 March 2022 with the officers determining that there was no evidence that a crime had been committed, there were jurisdictional issues, and even telling Plaintiff that he was free to contact Defendant Reynaud if Plaintiff so wished, although the office advised that Plaintiff refrain from having contact with a woman as "obviously unstable" as Defendant Reynaud was deemed to be.

- The Defendant Reynaud formally, in writing to police and other third parties, accused Plaintiff Reo of R.C. § 2917.211, disseminating pornographic material. Plaintiff never disseminated any such material.

- The Defendant Reynaud formally, in writing to police and other third parties, accused Plaintiff Reo of R.C. § 2917.21, telecommunications harassment. Plaintiff never engaged in telecommunications harassment of Defendant Reynaud, on the simple basis that Defendant Reynaud never responded to one of Plaintiff's emails and never requested that Plaintiff stop emailing her.

- The Defendant Filed six reports with the Federal Bureau of Investigation (FBI) making similar assertions about the Plaintiff that she did to police in both Belgium and Ohio.

## INFORMATION/INPUT RECEIVED TO FORM OPINIONS

In connection with my preparation of this report, I have received and reviewed from the Plaintiff's legal counsel, the following documents and information relating to this case:

Complaint

Bryan Anthony Reo v Ludivine Joan Claudia Reynaud (March 31, 2022)

Legal Documents

- Answer (June 6, 2022)
- Defendant's Responses and Objections to Plaintiff's Interrogatories.
- Supplemental Responses to Plaintiff's Interrogatories Nos. 12 and 13 (September 2, 2022)

Miscellaneous Documents

- Mentor Police Case Report (March 28, 2022)

Emails

- Ludivine Joan Claudia Reynaud to medvec@cityofmentor.com (March 3, 2022) .
- Ludivine Joan Claudia Reynaud to Daniel Shaw (March 4, 2022)
- Ludivine Joan Claudia Reynaud to Daniel Shaw (March 10, 2022)
- Daniel Shaw to Ludivine Joan Claudia Reynaud (March 11, 2022)
- Ludivine Joan Claudia Reynaud to Daniel Shaw (March 11, 2022)
- Dan Mohar to Ludivine Joan Claudia Reynaud (March 11, 2022)
- Ludivine Joan Claudia Reynaud to Dan Mohar (March 11, 2022)
- Dan Mohar to Ludivine Joan Claudia Reynaud (March 15, 2022)
- Ludivine Joan Claudia Reynaud to Dan Mohar (March 15, 2022)
- Lauren De Vos to Dustin Richards (March 20, 2022)
- Dustin Richards to Dan Mohar (March 21, 2022)
- Ludivine Joan Claudia Reynaud to Brian Anthony Reo (March 31, 2022)
- Brian Anthony Reo to Ludivine Joan Claudia Reynaud (March 31, 2022)

Internet Research

During this assignment, I conducted research to obtain information on the internet as well as to seek clarification and definition on various subjects.

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff as well as conversations with him provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

## ANALYSIS AND OPINIONS

Preface

Following are my conclusions and opinions as they pertain to the issues I was asked to address as outlined in the previous "Assignment" section of this report. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the

"Information/Input Received to Form Opinions" section of the report.  The information, which emanated from both sides in this litigation, reflects both of their understandings of the facts as well as their interpretations and views of them.  In some instances, they agree on information and facts and in others they don't.  It is not my task or responsibility to determine who is right or wrong; that will be determined in court.  My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true.  Where there is a disagreement, since I was retained by the Plaintiff, I will presume that the information provided on his behalf is correct and will base my conclusions and opinions on it being true unless I am aware of – or will be subsequently provided - evidence to the contrary.

Methodology

To reach these conclusions and opinions, the methodology I used in this case is consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case in making their determinations and offering their findings, conclusions and opinions.

- Carefully reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well any other unrelated information that is germane to this the issues in contention in this case.

- Carefully analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

- Queried Plaintiff Reo to get additional information and clarification as needed.

- Researched information as needed on the internet.

- Applied the principles of negative communications to this case as appropriate.

- Reviewed and analyzed previous applicable experiences I have had in my professional communications and expert witness background that may be applicable to this situation and would provide me with insight to assist me in forming my conclusions and opinions.

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of types of analyses or fact gathering procedures.  They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them.  This is covered in Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

My five-decade background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 16 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

General Overview

After reviewing all the aforementioned documentation and informational materials along with input I have received on the lawsuit and the factors which precipitated the filing of it, I believe that the Defendant through her alleged false statements, misrepresentations and actions caused potentially severe reputational damage to the Plaintiff.

Reputation Importance

One's reputation – regardless of whether it is a person, business, organization or any other type of entity is critical because that is most often the "prism" through which the subject is view and/or judged.  According to an amalgamation of definitions offered by the Cambridge, Oxford and Merriam-Webster dictionaries, reputation is defined as:

> *"The beliefs or opinions that are generally held about someone or something. The overall quality or character as seen or judged by people in general; the opinion that people in general have about someone or something or how much respect; the estimation in which a person or thing is held."*

In the public relations profession, there is an old "tried and true" axiom that is sacrosanct and that is "perception is more important than reality."  Reputation and perception are basically interchangeable in this context.

Special Reputational Damage

It is important to note that there are varying levels of reputation damage.  There are many types of businesses and professions that can experience, survive and shake off negative information about them that might stain their image, reputation, brand and the good will with those they service.  There are some that cannot because of the nature of what they do and the impact on those they serve.  They are held to a higher standard and forgiveness is rare.  This includes educators (who mold our children), law enforcement (which safeguard the public), financial professionals such as accountants, financial planners, investment advisors (who protect financial well-being) and the clergy (who are responsible for spiritual well-being).  This is also true of legal practitioners (e.g., attorneys) who are charged with protecting the legal rights of their clients.  It is highly unlikely that some individual or entity would retain an attorney that has received negative exposure for harassing a woman, denigrating her on the internet and placing nude and sexually explicit photographs of her on pornographic website as well as other forms of misconduct against Plaintiff Reo especially damaging.

Impact/Effects of Reputational Damage and Harm

Prior to addressing the reputational harm in this case, there is one critical factor that needs to be understood and considered when analyzing the real and potential reputational harm to the Plaintiff because of false statements, misrepresentations and actions of the Defendants which has already had a negative impact on the Plaintiff.      19

When assessing a situation involving reputational harm and damage, it is important to understand how a stained reputation not only has a detrimental impact emanating from the Defendant in this case contributing to the negative communications but also the added negative consequences that occur when the Defendants will also be the catalyst to cause the negative communications to spread the reputational harm and damage to negatively influence even more people. These forms of reputational "negative communications" (e.g., word of mouth) are then communicated, transmitted and perpetuated which then often result in additional exposure that takes on a life of their own both in terms of the disparaging content and widespread distribution. Also, it is nearly impossible to counteract or negate the harmful effects of this negative reputational spread either in the short or long term.

There are several sayings that are apropos in relation to the dissemination of negative information about some person and/or entity - regardless of whether it is true or not, to wit:

- It takes years to establish a reputation and seconds to destroy it.
- You can't un-ring a bell.
- You can never wipe a slate clean
- Where there is smoke, there is fire.
- Perception is more important than reality

There are two methods of disseminating negative information (or, in this instance, a negative reputational view of the Plaintiff) – controlled and uncontrolled. "Controlled" means that one can pinpoint everyone who actually was exposed to the negative communications passed on (e.g., person-to-person remark, written communication to only certain people, a speech to a group of people) in a contained environment. The theory here is that only these people have the information and they have hopefully not yet passed it on in any way (e.g., word of mouth, written communication). When this occurs, there is a chance to be somewhat effective in refuting it by reaching those people and providing an opposing view to the input they received.

"Uncontrolled" means that either the negative communications resulting in the negative reputational view has already passed it on in various ways to others that cannot be identified or contacted – or it was disseminated in such a way (e.g., in the media or on internet) that there is no way of knowing exactly who received it or what they may have done with that information (e.g. disseminate it to others). In this instance, it is impossible to ensure that everyone exposed to the negative communications has access to the opposing viewpoint – and thus, without any counter information, the original (negative) view or opinion formed because of it could be considered to be accurate making it extremely damaging.

In this case, it is my opinion that both the "controlled" and "uncontrolled" methods of communication would clearly apply. While, initially, the allegations by the Defendant were "controlled" because they were made to specific individuals in law enforcement agencies in Brussels and Mentor, according to the Plaintiff the "word of mouth" factor has caused word to spread throughout the Mentor legal community (e.g., police, prosecutors, judges) which has led to more widespread exposure. As the Plaintiff makes his living (attorney) in the same field as the Defendant is making the negative reports to (e.g., law enforcement, justice system), this has more of a harmful effect to him because he has to work with and interact with people in this field on a day-to-day basis and could also damage his ability to get new clients based on referrals from them. Also, because the allegations are permeating the same professional field, the supplemental distribution of the negative communications most likely would be substantial because of the natural interest of others in the legal field. Therefore, it is clear that the reputational damage was extensive, widespread and impactful.

20

Negative impressions or perceptions once implanted can often never be completely erased or overcome – to some people completely and for others, to a certain degree.

- To change their thinking is never as effective because the person may have already given credence to the initial opinion, or they will filter the second outlook through the original information received (not a clean slate).

- Even if people receive a contrary view, there could always be an element of doubt (e.g. where there is smoke, there is fire).

- If someone receives contrary views of a reputation, and doesn't know which is right, it would be human nature to take a conservative approach to steer clear of the subject of the information (e.g., "why take the chance") and go with another choice.

- People will believe a negative impression or perception of a reputation if it seems plausible and there is no counterbalancing input that refutes or challenges that information.

- As a negative reputation is communicated to others, when there is no way to identify who has received the information, there is no chance to provide them with the correct the negative impression or perception.

- When a damaged reputation is communicated and isn't countered, it can be passed on by "word of mouth." This is particularly dangerous and harmful because when passing this view from one person to the other, the original view can be misinterpreted, exaggerated, embellished and/or distorted which could make it even more negative in nature.

- Finally, and most importantly, if the negative impression or perception cannot be stopped with the original people who heard it, it can go on forever and the spreading of it can be limitless.

In short, reputational damage through negative communications can be devastating and lasting.

## ANATOMY OF REPUTATION HARM

In his lawsuit the Plaintiff cites the Causes of Action of Common Law Defamation and Invasion of Privacy – False Light. As an expert witness, I am not allowed to offer a legal opinion as to the validity of those claims. That is for the trier of fact (i.e., jury) to determine. My professional background, experience and expertise does, however, qualify me to assess the reputational damage and/or negative consequences emanating from the words and actions of the Defendant which led to this litigation. In the Case Background section of this report, I outlined in detail the relationship of the two parties and their actions and words which led to the filing of this lawsuit. In this section, I will seek to offer some context and perspective to this situation.

### Brief Summary

Following the separation with his wife who moved to Brazil, Plaintiff Reo and Defendant Reynaud met online and developed an intense romantic relationship. Reynaud traveled from Belgium to the United States (with Reo's knowledge and consent) to join with Reo to take the relationship to the next level. This occurred. Reynaud returned to Belgium to make the

21

arrangements to migrate to the United States permanently and marry and raise a family with Reo (which he concurred with). Covid-19 came, and this action was put on hold for a long period. In the meantime, Reo reconciled with his wife. He informed Reynaud which upset her greatly. While they continued to communicate on and off, the relationship became very volatile and stormy. Reo eventually sent a quasi-"cease and desist" communication to Reynaud and threatened a lawsuit if she didn't. In turn, Reynaud contacted law enforcement authorities in both Brussels and Mentor and filed complaints (cited in the earlier section). As a result, Reo subsequently filed a lawsuit against Reynaud in March of 2022. Reynaud is still active filing charges against Reo and has expanded her complaints to the FBI and Department of Justice.

<u>Defendant's Allegations</u>

According to the Cambridge English Dictionary, the word "allegation" is defined as:

> *"A statement, made without giving proof, that someone had done something wrong or illegal."*

This appears to be the case with Reynaud's claims against Reo. Following are excerpts from the Defendant's response to interrogatories from the Plaintiff:

- *"Defendant has never claimed and has no evidence to support the contention that the Plaintiff has ever: (a) engaged in the crime of dissemination of pornographic material, or (b) engaged in the crime of dissemination of obscenity. I have always described my concern that the Plaintiff might have impersonated me on these sites as speculative, unproven and merely a hunch.*

- *(To Mentor Police) I did say that the Plaintiff might have been responsible for spoof postings on websites using my name, but expressly stated that I did not know this for a fact and could not prove it. The statement was not false because it represented my opinion as to who might possibly be responsible, but qualified that opinion so that the Police would understand that I could not make a firm allegation of fact.*

- *But I never accused the Plaintiff of doing so to the Police or anyone else, and do not believe that pornographic content (meaning nude, seminude or sexually explicit pictures of me) was disseminated online and I never claimed otherwise.*

- *I have never contended the material that I found consisted of nude, semi–nude or sexually explicit photographs of me or any other type of content other than the content described above, relating to my name linked or associated with pornographic websites.*

- *Q  Have you ever permitted any person to photograph you nude, provided nudes to any person, or created a recording (digital or otherwise) of yourself nude or engaged in a sexual act?*

  *A  No.*

  (Side note: If she never was photographed nude, how could she accuse Reo or anyone else of putting such photographs on the internet?)

22

Reynaud further reiterated that she had no proof of her allegations in correspondence to law enforcement officials in Mentor, and even to Reo. Following are excerpts from correspondence that Reynaud had sent to various individuals when making allegations against Reo:

- In her March 3, 2022 report to the Mentor Police Department:

  *"He may possibly have used spoof accounts to contact me on one social media platform as well as impersonated me on porn sites (given that platform do not yield IP address information without a court subpoena, I cannot begin to prove his involvement in this however)."*

- In the March 4, 2022 to Shaw, she wrote:

  *"Apparently porn sites have also been used – I cannot prove his involvement in this, however, as I do not have information pertaining to the IP addresses."*

- In a March 11, 2022 email to Shaw, she wrote:

  *"This person is using my professional email address (which I cannot have changed) and that of my supervisor (which cannot be changed) also, apparently, creating fake accounts to tell stories about myself on social media platforms (I can't prove it without the IP address) though)."*

- In a March 31, 2022 email to Reo, she wrote:

  *"With respect to the porn sites, I cannot prove your involvement in this given that sites do not give IP address for legal reasons. Results appeared on cached Google search results, but I can't tell who was involved. I wrote as much to Mr. Shaw, who is a police officer in Mentor Ohio. If you say that was not you, then that is perfect.*

## Negative Effects/Harm to Plaintiff

The Plaintiff reports that the damage to his reputation has translated into a wide array of harmful and negative consequences which he has experienced in the short term and which it expects to continue in the future. The negative repercussions have included:

- Severe damage to his reputation, both professionally and personally.

- Significant damage in the legal community to include government officials, law enforcement personnel, and professionals in the justice system (e.g., judges, attorneys, investigators)

- Disruption to his business and legal practice.

- Extensive time required to respond to queries from law enforcement officials and to cooperate with authorities in their investigations in Belgium and the United States) as well as to engage in litigation.

- Significant costs to fund litigation to clear his name and protect his reputation.

23

- The Plaintiff also reports the loss of clients because of the Defendant's allegations as well as the assistance of individuals who collaborated on cases with him.

## Harm in the Future

In addition to the negative consequences from reputation harm that the Plaintiff has already suffered, he anticipates that the Defendant's words and actions will continue to cause damage in the future, to include:

- The Plaintiff has reason to believe he may be facing an indictment in Belgium due to the Defendant's allegations and, as a result, he has had to hire a criminal defense attorney in Belgium. He expressed concern that he may not be able to enter a European Union country in the near future because the possibility of being arrested.

- The Plaintiff stated that the Defendant Reynaud knows of his ambitions to become a part-time or auxiliary police officer (deputy sheriff), an adjunct law professor and ultimately a trial court judge. Therefore, by smearing him in his close-knit community with what she knew would be a publicly accessible record/report, she was aware that it would likely derail his ambitions in those regards or at least greatly hinder his ability to enter into those respective fields.

## Evaluating the Causes of Action

As stated earlier in this report, the Causes of Action I am opining on as cited by the Plaintiff in his Complaint against the Defendant are Common Law Defamation and Invasion of Privacy – False Light. Following is the legal definition of each under Ohio law:

- Common Law Defamation: This occurs when a publication contains a false statement 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession. *(Jackson v. Columbus, 117 Ohio St.3d 328, 2008-Ohio-1041, ¶ 9, quoting A & B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio St.3d 1, 7 (1995).)*

- Invasion of Privacy – False Light – This occurs when one "gives publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *(Welling v. Weinfeld, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051.)*

Based on these definitions, the information, insight, conclusions and opinions I offer in this report would clearly indicate that the criteria for these two Causes of Action would appear to be met (not a legal conclusion). Using the criteria contained in them and weighing them against the content in this report, I believe that the following is true:

- False statements and allegations against the Plaintiff were made by the Defendant.

- The Defendant did so with "fault" (e.g., admitted that she had no proof or evidence for all the false claims she made).

24

- The allegations would, and did, cause the Plaintiff reputation harm.

- Anyone exposed to the Defendant's allegations could result in the Plaintiff to be the object of hatred, contempt, ridicule, shame or disgrace for the alleged acts she purported that he committed.

- As the Plaintiff is an attorney, such illegal acts he was accused of would particularly adversely affect him in his profession and his business (e.g., law firm).

- His purported actions would certainly be viewed by a "reasonable person" as highly offensive.

- The Defendant clearly knew she was acting with "reckless disregard" because she stated repeatedly that had no proof for the heinous crimes (e.g., pornography) for which she was accusing him.

According to the Plaintiff, within two hours of his emailing the lawsuit to her on March 31, 2022, Reynaud contacted the Ohio State Bar Association and asked how to file an ethics grievance against Plaintiff. He avers this could be interpreted as an indication of common law malice and an example of the vexatious hatred of him as well as of her desire and willingness to do anything in her power to try to maliciously harm the him. Reynaud had threatened the Plaintiff, on the day of the lawsuit filing on a phone call. She reported stated that if he did not dismiss the lawsuit she would work to get him charged with a crime; she also threatened his career. The Plaintiff feels she has worked diligently to attempt to make good on her threats.

## REPUTATIONAL DAMAGE COMPENSATION

The Plaintiff justly deserves to be compensated for the "pain and suffering" he has incurred as well as the harm and damage to his reputation which emanated from the Defendant's alleged false statements, misrepresentations, and actions as well as the resulting negative consequences to him. Also, even if the Plaintiff prevails in this litigation, the negative exposure he has suffered because of the Defendant will always be present to some degree (i.e., "One cannot wipe the slate clean") and will continue to cause reputational harm and damage to him professionally well into the future.

Factoring in this negative impact on the Plaintiff, it would be appropriate and reasonable that the Plaintiff justifiably receive fair compensation from the Defendant based on the extent of the reputational damage and the massive disruption to his business and career as reflected in the observations, comments and opinions I have expressed in this report. The Plaintiff has determined that a damage award in the range of $80,000 to $120,000 would be fair and equitable for the negative consequences he has, is and will experience. Based on my background and experience in observing the negative consequences impacting those victims of reputation damage, I feel that this is an equitable amount of compensation for the harm the Plaintiff has incurred. The Plaintiff will also seek to recover legal and court costs.

## CONCLUSION

It's difficult to categorize what led to this situation. Disputes among two individuals in a personal, social and/or romantic relationship is obviously not uncommon whether they are in close proximity to each other or afar. Human nature is what it is. A lot of factors are prevalent here, including: a long-distance relationship; the advent of Covid which resulted in the

disruptions to their plans; the Plaintiff's apparent reconciliation with his wife; and the Defendant's anger at that occurrence which led to her actions.  Quite possibly, the famous old idiom "Hell hath no fury like a woman scorned" probably applies here.  Regardless, the Defendant's personal vendetta against the Plaintiff, which led her to seek to have him arrested by multiple law enforcement agencies in two countries for actions that she self-admittedly said she had not evidence of – is rather incomprehensible and clearly quite harmful.  This apparently relentless and vitriolic campaign by her to get the Plaintiff arrested for criminal acts also clearly reeks of malice (albeit I'm not offering that as a legal opinion).

In summary then, it is my professional and expert opinion - based on all available evidence, the information I reviewed as well as my experience and expertise in the communications field and as an expert witness - that the Causes of Action of Common Law Defamation and Invasion of Privacy - False Light cited by the Plaintiff, Bryan Anthony Reo, in his lawsuit against the Defendant, Ludivine Joan Claudia Reynaud, are valid based on the observations, conclusions and opinions I have offered in this report.  (Note:  To reiterate, this is not a legal opinion and such determination will be made by the trier of fact.  However, it represents my personal opinion based on my background and expertise for which I was retained as an expert witness.)

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date.  Based on receiving additional documents or information (e.g., legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

_____      _October 10, 2022_
    Robert J. Fisher             Date

26